## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD BYRNE, and CHRISTOPHER BALLENTINE, Derivatively on Behalf of AQUA METALS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br><br> STEPHEN R. CLARKE, THOMAS MURPHY, SELWYN MOULD, VINCENT L. DIVITO, MARK SLADE, and MARK STEVENSON, <br><br> Defendants, <br><br> and, <br><br><br> AQUA METALS, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Richard Byrne and Christopher Ballentine (collectively, the "Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Aqua Metals, Inc. ("Aqua Metals" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Aqua Metals with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Aqua Metals against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duty, breach of fiduciary duty against insider selling, unjust enrichment, abuse of control, waste of corporate assets and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder.

## JURISDICTION

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

3.     Venue is proper in this Court because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Aqua Metals occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

A.     **Plaintiffs**

4.     ***Plaintiff Richard Byrne*** is, and was, a shareholder of Aqua Metals during the

time Defendants were breaching their fiduciary duties.  Plaintiff Byrne is a resident of the State of Kansas.  Plaintiff Byrne will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

5.      ***Plaintiff Christopher Ballentine*** is, and was, a shareholder of Aqua Metals during the time Defendants were breaching their fiduciary duties.  Plaintiff Ballentine is a resident of the State of California.  Plaintiff Ballentine will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**B.      Nominal Defendant**

6.      ***Nominal Defendant Aqua Metals*** is a Delaware corporation with its principal executive offices located at 1010 Atlantic Ave., Alameda, CA 94105.

**C.      Director Defendants**

7.      ***Defendant Stephen R. Clarke*** ("Clarke") was, at all relevant times, the President, Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of the Company.  On March 27, 2018, Clarke informed the Company that he declined to stand for re-election at the Company's 2018 Annual Meeting of stockholders.  Upon information and belief, Clarke is a resident of California.

8.      ***Defendant Thomas Murphy*** ("Murphy") was the Chief Financial Officer ("CFO") until August 10, 2017 and a Director of the Company until August 30, 2017.  During the Relevant Period when the Company misstated information to keep the stock price inflated, and before the scheme was exposed, Murphy made the following sales of Company stock (and made no purchases of Company stock).  On March 8, 2017, Murphy sold 20,000 shares of Company stock for $17.24 per share.  On April 10, 2017, Murphy sold 20,000 shares of Company stock for $17.25 per share. On May 8, 2017, Murphy sold 20,000 shares of Company

stock for $17.52 per share.  Upon information and belief, Murphy is a resident of California.

9.     **Defendant Selwyn Mould** ("Mould") has served as the Company's Chief Operating Officer ("COO") since June 2014.  Since August 2017, Mould has been a member of the Board. During the Relevant Period when the Company misstated information to keep the stock price inflated, and before the scheme was exposed, Mould made the following sales of Company stock (and made no purchases of Company stock).  On March 7, 2017, Mould sold 20,000 shares of Company stock for $17.03 per share. On April 3, 2017, Mould sold 20,000 shares of Company stock for $18.92 per share. On May 1, 2017, Mould sold 20,000 shares of Company stock for $16.54 per share.  On March 28, 2018, Mould informed the Company that he declined to stand for re-election at the Company's 2018 Annual Meeting of stockholders.  Upon information and belief, Mould is a resident of California.

10.     **Defendant Vincent L. DiVito** ("DiVito") has served as a Board member of the Company since May 2015.  DiVito is the Chairman of the Audit Committee and is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, DiVito is a resident of New York.

11.     **Defendant Mark Slade** ("Slade") has served as a Board member since June 2015.  Slade is a member of the Audit Committee.   He also serves as Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.  Upon information and belief, Slade is a resident of the United Kingdom.

12.     **Defendant Mark Stevenson** ("Stevenson") has served as a Board member since December 2016.  Defendant Stevenson is a member of the Audit Committee.  Upon information and belief, Stevenson is a resident of the commonwealth of Australia.

13.     Defendants Clarke, Murphy, Mould, DiVito, Slade, and Stevenson are hereinafter

referred to as "Defendants."

14.     Defendants Clarke, Mould, DiVito, Slade and Stevenson are collectively referred to herein as the "Director Defendants".

## CODE OF BUSINESS CONDUCT AND ETHICS

15.     As members of the Company's Board, Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

16.     The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Aqua Metals, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

17.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Aqua Metals, Defendants owed Aqua Metals and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage Aqua Metals in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of Aqua Metals and its investors.

18.     Each director of the Company owes to Aqua Metals and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and

financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19.     To discharge their duties, the officers and directors of Aqua Metals were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Aqua Metals were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Aqua Metals conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

20.     Each of the Defendants, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Aqua Metals, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

21.     On May 19, 2016, Defendants caused the Company to issue a press release that announced a partnership between Interstate Battery System International, Inc. ("Interstate Battery") and Aqua Metals ("Interstate Battery Partnership").  The press release stated in relevant part:

ALAMEDA, Calif., May 19, 2016 (GLOBE NEWSWIRE) -- Aqua Metals, Inc. (NASDAQ: AQMS) (Aqua Metals), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, today announced the signing of definitive agreements with Interstate Batteries. Interstate Batteries is the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler.

***Upon the closing of these agreements, Interstate Batteries has agreed to supply more than a million automotive and other lead-acid batteries as feedstock for Aqua Metals' AquaRefineries.  This partnership will start with Aqua Metals'***

**first AquaRefinery, which will be located in Nevada's Tahoe-Reno Industrial Complex (TRIC) and is set to open in July 2016**. Interstate Batteries will also make a strategic investment of approximately $10 million into Aqua Metals.

*       *       *

"Interstate Batteries seeks out innovation, pursues opportunities and invests in the technology we need to succeed not just today, but also tomorrow," said Scott Miller, president and CEO of Interstate Batteries. "***Our focus is on the future of our industry and continued growth. Aqua Metals' breakthrough technology is a promising new way for recycling lead-acid batteries.***" Aqua Metals' patent-pending AquaRefining process is an environmentally friendly electrochemical process for recycling lead-acid batteries. ***Aqua Refining is a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery***.

"With its forward-thinking environmental goals, broad distribution network and strong brand name, Interstate Batteries is an ideal partner for us as we scale our business," said Dr. Stephen Clarke, chairman and CEO of Aqua Metals. ***"As we grow, we are able to create a more sustainable ecosystem for lead as a power source. We look forward to growing our partnership with Interstate Batteries."*** [Emphasis added].

22.     Following this press release, the price per share of Aqua Metals increased $2.26, or close to 29%, from a close of $7.80 on May 18, 2016, to a close of $10.06 on May 19, 2016.

23.     On August 2, 2016, Defendants caused the Company to issue a press release announcing the opening of the Tahoe-Reno Industrial Center ("TRIC") in McCarran, Nevada. The press release stated in relevant part:

ALAMEDA, Calif., Aug. 02, 2016 (GLOBE NEWSWIRE) -- Aqua Metals, Inc. (NASDAQ: AQMS) (Aqua Metals), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, held an open house at its first AquaRefinery at the Tahoe-Reno Industrial Center (TRIC) in McCarran, Nevada. AquaRefining is the world's first environmentally friendly process to recycle lead-acid batteries (LABs).

*       *       *

"The first AquaRefinery at TRIC is an exciting start to a cleaner future for the lead industry," said Stephen Clarke, CEO of Aqua Metals. "Lead-acid batteries are over 99% recyclable, but until now, there has been no way to recycle lead in an environmentally friendly fashion.  With this AquaRefinery and more expected

to come, Aqua Metals is doing its part to create the most sustainable battery technology the world has ever seen, while also providing economic benefits to recyclers, manufacturers and distributors."

The proprietary AquaRefining technology extracts lead from LABs with a room temperature, closed-loop, water-based process that results in vast reductions of hazardous waste and direct human contact with the lead itself. *The process produces lead that is as pure as – or purer than – mined lead, requiring no secondary processing*. Battery Systems Inc. has a 200,000 square foot battery distribution and collection facility adjacent to Aqua Metals' TRIC facility. Interstate Batteries, which made a $10 million investment into Aqua Metals, has already committed to provide used LABs to recycle at the facility. Interstate Batteries controls 20 percent of the lead-acid battery recycling market in the United States.

*        *        *

"This first-ever AquaRefinery has the potential to change our industry, and our planet," said Scott Miller, president and CEO of Interstate Batteries. "While we've been in the battery business for more than six decades, Interstate continues to seek out innovation and invest in technology for today, and tomorrow. *Because Aqua Metals' breakthrough technology is so promising, Interstate Batteries is supplying more than a million automotive and other lead-acid batteries to the AquaRefinery over the next year.* We feel we're making a smart investment in our future, and in the future of our industry." [Emphasis added].

24.    On November 1, 2016, after the market close, Defendants caused the Company to

issue a press release that announced production of the first refined lead at the TRIC.  The press

release stated in relevant part:

ALAMEDA, Calif. – November 1, 2016 – Aqua Metals (NASDAQ: AQMS) today announced that it has produced the first-ever AquaRefined lead at its flagship AquaRefinery in McCarran, Nevada. AquaRefining is a water-based, room-temperature process and is the only clean lead recycling method.

"This is a major milestone – *not just for our company, but for the entire industry," said Dr. Stephen R. Clarke, Chairman and CEO of Aqua Metals. "Our commercial-scale AquaRefining modules have the potential to revolutionize lead recycling and make lead-acid batteries the only truly sustainable battery technology. We are confident that our lead products will exceed the most rigorous industry specifications*.  I am extremely proud of our entire team for making this dream a reality."

AquaRefining uses an entirely reusable water-based technology to produce ingots

of ultrapure lead. Through its own on-site assay, Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure.   The Company will send its initial production samples to several U.S. battery manufacturing companies—which collectively represent over 50 percent of U.S. battery production—to allow them to conduct their own assays.

Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer. ***The Company has now produced high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada.***

"This is the most critical step in the commissioning process of the Nevada AquaRefinery," Dr. Clarke continued. "Over the coming weeks we plan to fully integrate the front-end battery-breaking portion of the facility."   [Emphasis added].

25.     On February 9, 2017, Defendants caused the Company to issue a press release that announced a battery recycling technology partnership between Johnson Controls International plc ("Johnson Controls" or "JCI") and Aqua Metals ("JCI Partnership").  The press release stated in relevant part:

"ALAMEDA, Calif., Feb. 9, 2017 /PRNewswire/ -- Johnson Controls (JCI), finalized an agreement covering North America, China and Europe for a cuttingedge electrochemical battery recycling technology. Under terms of a multifaceted deal, the company is investing in Aqua Metals (AQMS).

                          *       *       *

***"Our partnership with Johnson Controls is a tremendous step forward and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling,"*** said Dr. Stephen Clarke, chairman and CEO of Aqua Metals. "We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world."

Under the agreement Johnson Controls will also:

☐       Become the first licensee for AquaRefining™ technology

☐       Supply Aqua Metals with batteries to recycle as a service, as part of the Johnson Controls closed-loop networr

☐       Purchase AquaRefined™ metals produced from Aqua Metals' facilities

☐    Acquire just under 5 percent of Aqua Metals outstanding shares

☐    "Agreements like this are a part of our continuing strategy to invest in clean technologies, building on our commitment to create a more sustainable and environmentally responsible industry," said Joe Walicki, president of Johnson Controls Power Solutions.

Aqua Metals, which recently opened its first plant in McCarran, Nevada, uses an advanced electrochemical process for recycling batteries. ***As it scales up capacity, Aqua Metals plans to hire hundreds of employees for existing and future operations across the United States."*** [Emphasis added].

26.    Following this press release, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 on February 8, 2017, to a close of $16.16 on February 9, 2017.

27.    On February 14, 2017, Defendants caused the Company to issue a press release that announced the Company's financial and operating result for the fiscal fourth quarter and fiscal year ended December 31, 2016.  For the year, the Company reported a net loss of $13.6 million, compared to a net loss of $12.3 million in the previous fiscal year.  The press release stated in relevant part:

> ALAMEDA, Calif., February 14, 2016 – Aqua Metals, Inc. (NASDAQ: AQMS), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the fourth quarter and fiscal year ended December 31, 2016.
>
> **Company Highlights**:
>
> Successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC)
>
> •    Signed a strategic partnership covering North America, China and Europe with Johnson Controls, the world's largest manufacturer of automotive batteries. Under the agreements, Johnson Controls has invested $10.6 million for approximately 5% of Aqua Metals outstanding shares; become the first licensee for AquaRefining technology; agreed to supply Aqua Metals with batteries to recycle as a service; and agreed to purchase

AquaRefined metals produced from Aqua Metals' facilities.

- Signed a strategic partnership with Interstate Batteries, the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler. Under the agreements, Interstate Batteries made a strategic investment of approximately $10.0 million into Aqua Metals, and agreed to supply lead-acid batteries as feedstock to Aqua Metals.

**Management Commentary**

*"2016 was a pivotal year for the company, as we successfully built, commissioned and began producing products at the world's first AquaRefinery and deepened our strategic relationships with major players throughout the industry," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals. "Our partnerships, most recently with Johnson Controls—the global leader in automotive battery manufacturing and responsible recycling— and Interstate Batteries—the largest independent battery distribution system in North America and the country's leading battery recycler. — and Battery Systems Inc. – one of the largest independent battery distributors in the U.S. effectively rounds out a sustainable ecosystem for the automotive lead acid battery industry and provides a level of supply and off-take to support our expansion of AquaRefinery 1 and the construction of additional facilities.* [Emphasis added].

28.     That same day, during a conference call to discuss the Company's financial and operating result for the fiscal fourth quarter and fiscal year ended December 31, 2016, Clarke commented about the production:

Thank you, Greg and welcome everybody to the 2016 year-end conference call. One of the headlines today is that the first ever AquaRefinery located at Tahoe Reno Industrial Center, has moved from commissioning to operational. *That means that we are breaking batteries and making lead from the batteries that we've broken, both from -- both metallic lead and Aqua-refined lead. It's continuing to ramp-up.* We are not at full scale yet and there is more work to be done.

*       *       *

So moving on. So let's talk about our Tahoe, Reno facility. *As I mentioned at the start, it's now running we have transitioned out of a mostly startup phase into a commissioning phase, into an operational phase*. [Emphasis added].

29.     During the Q&A session during the call, analyst Bhakti Pavani from Euro-Pacific

Capital, Inc. inquired about a "blueprint date" for the JCI Partnership to which Clarke responded in relevant part:

**Bhakti Pavani**

Got it. Okay. Thank you. Wanting to talk about the Johnson Control agreement, I know in the 8-K you did mention about there would be a mutually agreed blueprint date, especially with the equipment supply agreement. Have you guys -- could you maybe provide more color on what kind of timeline are we talking about?

**Stephen Clarke**

***Well we're on it already. I'm not going to get into two much more detail on that. We are -- both parties are working hard on this. We'll be making announcement on that in a few days.*** [Emphasis added].

30. Clarke then provided details on the technology, to assure the market about the overcoming of major challenges and operability of the process:

So our process is fundamentally different. We use a breaker while we use exactly the same source and equipment but our process runs wetter. And what we produce from our breaker is different in a key respect. We make the lead paste which is the active material in a batteries, lead acid, lead sulfate and spongy lead and co-compounds of those.

We also separate out metallic lead which is the good lead and the top lead. That is actually quite high value lead alloy, it's going to be produce back into good lead and it starts soft as good lead and one of the advantages of our process is we don't have to do anything more to that, other than [indiscernible] turn into ingots and sell it as lead alloy.

The other stack is that lead paste runs through a process that we've been calling desulphurization and then from there runs in to AquaRefining from which it's ingoted. One of the key point here is that the process that we call desulphurization in many respect is fundamentally different from the processes that operate in a smelter.

We have to take -- we choose to take much higher level of the sulfur out and we do some other proprietary steps to that paste before we put into our AquaRefining process. So one of the key process is here that we have to develop and scale was that multi-step desulphurization process.

So moving on and talk a little bit about what we learned along the way. So it was

the first kind, and we were surprised. There were a number of surprises encountered as we built this and we are a few months later than we hoped we would be in commissioning and transitioning TRIC from startup to operations. And I'm just want to talk about some of the lessons learned there.

So starting with the input side, we spent some time dealing with jams on the conveyor belt for the breaker, calibrating the several sourcing steps in that. We had some issues with seals and bearing which required redesigns and change outs. ***And we accomplished all of that in six months, which I believe is quite remarkable given industry standards.*** Then in the processes, transporting the lead paste from the breaker through desulphurization we had a number of redesign issues around pumps and materials handling and various other aspects as we learned that there are some differences in handling our paste input to desulphurization from a convention dry powder.

The desulphurization itself is a multi-step process. I'm not going to break it down because it's proprietary but this really was the first time that we operate this at scale. ***We've been able to run the AquaRefining systems because it's modular for several years now and to dial that technology in one of biggest challenges we had is that the desulphurization process operates in 40 to 80 tons a day of throughput***. This is something you can't really pilot or even test in a lab. It has to be built or worked out in real-time. ***It's a unique process and the big news is that we've got that dialed in now and it's operating. That means that we can provide feedstock to the AquaRefiners and make AquaRefined lead.*** [Emphasis added].

31.     During this call, Clarke emphasized the importance of the JCI Partnership and the

Interstate Battery Partnership:

So now I'll talk about the JCI agreements. There is really three phases to this, the first agreement is a tolling and lead purchase agreement in which JCI provide feedstock on a tolling basis. That means they provide the batteries and provide fee for us to convert those batteries into lead that we provide back to JCI.

\*          \*          \*

What does it all mean? Well, we have been working on this agreement with JCI for a number of months now, and looking at the tolling lead purchase agreement, I alluded for this a moment ago, it pretty much gives us all the supply. ***If we take what we've got with Interstate Batteries and Battery Systems Inc., and then lay on top, the demand and supply and off-take with JCI, it gives everything that we need to scale from 160 tons to 800 tons a day***.

As we've been talking to JCI for a number of months, we've been talking to providers of debt and non-dilutive finance for a number of months and we're

> looking at a $250 million package of finance, which really needs a high credit worthy third party to supply the batteries and take a lead. And so we believe that the bond we have with JCI and Interstate and Battery Systems Inc., actually meets a prerequisites for the supply and off-take part of a $250 million nondiluting finance package that will take us from AquaRefinery [. . .] there is a lot promising to actually close any particular debt finance package, but it certainly moves as a giant step forward to be able secure that.  [Emphasis added].

32.     On March 2, 2017, the Company filed a Form 10-K with the SEC announcing its financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("2016 Form 10-K").  Throughout the 2016 Form 10-K, the Company reapproved the previous statements.

33.     On May 9, 2017, the Company issued a press release that announced its financial and operating result for the fiscal first quarter ended March 31, 2017.  The press release stated in relevant part:

> ALAMEDA, Calif., May 9, 2017 – Aqua Metals, Inc. (NASDAQ: AQMS), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the first quarter ended March 31, 2017.
>
> **Company Highlights**
>
> Began production at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC). The company is currently in the process of scaling up production of AquaRefined lead to 120 tons/day by the end of 2017.
>
> In the first quarter of 2017, signed a strategic partnership covering North America, China and Europe with Johnson Controls, the world's largest manufacturer of automotive batteries. Under the agreements, Johnson Controls invested $10.6 million for approximately 5% of Aqua Metals outstanding shares and agreed to become the first licensee for AquaRefining technology, supply Aqua Metals with batteries to recycle as a service and purchase AquaRefined metals produced from Aqua Metals' facilities.
>
> *     *     *
>
> **Management Commentary**
>
> "With the world's first AquaRefinery now in commercial operation and

generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals. "We currently have shifts A and B completely staffed, and plan to complete our recruitment efforts for shifts C and D in the next month. Since day one, we've remained focused on building a team and the proper foundation, which would allow us to rapidly expand our innovative lead recycling technology and deliver better quality solutions to our partners and the market as a whole.

"***Given we have all of the necessary permitting in place and the support provided by strategic partnerships with some of the largest players in the battery industry***, we are taking the opportunity to implement the lessons learned during commissioning of AquaRefinery 1 which will accelerate our roll-out of additional facilities. These improvements and our ongoing work with our strategic partners is creating a blueprint for future facilities – both for our own and for our partners. Our goal is to roll-out facilities in the rest of North America, China, the European Union and elsewhere, based upon this blueprint."

Clarke, continued: "***Since our last update, we've not only expanded our current strategic relationships, but continued discussions with potential strategic partners in complementary areas, which could help us accelerate expansion***. As a technology company, we are keenly focused on delivering high value products that can be used for advanced battery applications. With this in mind, we recently announced our acquisition of Ebonex, which we acquired for the purpose of accelerating the development and testing of our nano-structured lead as a high performance active material and potentially use their Ebonex™ material as a complimentary additive. Through this acquisition, our goal is to develop technology, equipment and processes that will eventually allow our customers to deliver 'better' batteries.

"***For the remainder of 2017, we plan to ramp up production at AquaRefinery 1 and to prepare for accelerated build-out of additional facilities, while concurrently moving forward with our plans for additional AquaRefineries***, securing non-dilutive financing to accommodate our growth and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018." [Emphasis added].

34.     The statements set forth above were false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company was aware of and ignoring material unresolved deficiencies in the AquaRefine

technology and process preventing large scale development; (b) the Company was experiencing numerous execution and operational issues preventing scaling and production ramp up at its facility; (c) the Company was unable to produce and generate revenue from its core business, therefore remaining unprofitable, and (d) as a result of the foregoing, Defendants' statements about its business and operations were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

35.     On May 9, 2017, Clarke described a long list of unresolved and/or partially resolved issues the Company was in fact facing with the development of its technology, stating in relevant part:

> On the next slide I am going to go through some of the improvements that we developed and ***some of the issues we faced and the challenges that we had as we ramped up this process***. So anybody who has worked in the battery recycling industry knows that breakers break. Breaking and separation is the most challenging process for any battery recycling Company. And what we can say is it took longer than we planned to get the breaking and separation up and running, but actually considerably shorter than industry norms. ***One of the challenges that was unique to us that we faced is that, because we don't have a smelter, we don't have a furnace, we needed to achieve much higher degree of separation than is normal in this industry***.
>
> And what I mean by that is our plastic had to be clean plastic with no lead oxide and no lead dust on it. Our metallic lead had to be metallic lead with no plastic and no lead oxide and no lead sulfate on it. Our lead compounds had to be lead oxide, lead sulfate and other lead compounds with no plastic and no metallic lead in it. That's a really tough order and we achieved it. And we worked very closely with Wirtz Engineering who have been tremendous in this operation. We asked them to do things that no other battery breaking Company has ever been asked to do. It took us a while to get there but we achieved it and we developed and implemented numerous, far too numerous to mention, upgrades to support what is essentially an industry-leading level of separation. And we think that's something that we are working actually on developing to know how and maybe even some IP down the line. But when we talk about breaking and separation we are operating at levels of separation that we don't know of anybody else in the industry even close to.
>
> One of the other things that we -- well, a couple of other things that we have done in the breaking and separation areas, we figured out fairly early on that to be able

to operate over 24 hours and match timing of phasing between breaking and the next stages down the line, we needed to improve and upgrade our holding tanks, which we are doing, with higher capacity holding tanks with better mixing. One of the other issues that we faced, we needed to rethink and rework the input conveyor to the breaker to upgrade it to support the higher feed rates that we want to achieve to manage 160 tonnes a day of lead production. Initially we undersized that because we planned for 80 tonnes a day. And rather than stop when we are at scale we thought we would upgrade it sooner rather than later.

Looking at the aqua preparation, which is where we make the electrolyte, we were later -- quite a bit later and slower in being able to bring this online. ***Initially because of intermittent supply from the breaker, without consistent high quality lead compounds from the breaker it's very difficult to commission the processes that turn that and turn it into electrolyte. We weren't idle though. Whilst we had this spare time and capacity we actually used that to switch to an improved and lower cost chemistry for our desulfurization and separization technology which is a real big benefit down the line.*** And we learned some tough lessons on tank mixing and filtration which needed to be changed and upgraded to improve reliability, but the aqua preparation now is up and running.

Similarly with AquaRefining, those of you who followed us knew that we had a module online in October and we were struggling to -- with intermittent supply from both aqua preparation, which was struggling with intermittent supply from the breaker, to get sufficient electrolyte up and running to commission all of the modules. ***So we were limited to only have the electrolyte to run a single module until that opportunity, again to learn, to improve and to implement.*** So we used that delay in commissioning the additional AquaRefining modules to test and implement numerous upgrades that have improved potential liability, lifetime, reduced cost and improved consistency of operation.

And last but not least, again, same theme here, we were struggling to commission the ingot casting process because, again, of intermittent supply of processed lead. We've now got all of that and the ingot casting is -- commissioning is underway. So moving on, the AquaRefinery that we are working towards and we are on track to be at 120 metric tons a day by the end of the year, I want to say by the end of the year. We are hoping to be there sooner than that. But essentially where we are at now is modules five to 16 are being assembled to the latest engineering standard. Ingoting is being commissioned.  [Emphasis added].

36.    On the release of the news, the stock price declined $4.34 from a close of $16.65 per share of Aqua Metals stock on May 9, 2017, to a close of $12.31 per share on May 10, 2017, a drop of approximately 26%.

**ADDITIONAL MISSTATEMENTS**

37.     On May 31, 2017, Defendants caused the Company to issue a press release

announcing analyst's tour of TRIC, the Company's facility.  The press release stated in relevant

part:

> Analysts tour AquaRefining™ facility operations, meet with executive team
> ALAMEDA, Calif., May 31, 2017 (GLOBE NEWSWIRE) -- Aqua Metals, Inc.
> (NASDAQ: AQMS), ("Aqua Metals" or the "Company"), which is
> commercializing a non-polluting electrochemical lead recycling technology called
> AquaRefining™, today successfully hosted its first analyst visitor day.
>
> The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno
> Industrial Complex (TRIC), led by Aqua Metals' executive management team.
> ***Analysts were able to view the critical processes at the AquaRefinery as they
> happened, including: battery feedstock deliveries; battery breaking and
> separation; desulfurization and pre-AquaRefining digestion processes;
> AquaRefining on simultaneously running AquaRefining modules; and
> shipments of lead products to customers***.
>
>             \*       \*       \*
>
> "It has been a busy few months for our team as we continue to pursue our
> production milestones and step ever closer to full output of AquaRefined lead at
> TRIC," said Dr. Stephen R. Clarke, CEO and chairman of Aqua Metals. "We aim
> to be as transparent as possible while protecting our IP, as we expand our
> operations and collaborate with new partners. This was a valuable opportunity to
> open our doors to the analyst community, providing a behind-the-scenes look at
> our process."
>
> The Company expects all the analysts who attended the visitor day to update their
> coverage reports to reflect findings from the site visit in the coming days.
> AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes
> of lead products per day by the end of 2017. Aqua Metals is currently also
> working on plans to build a second AquaRefinery and integrating AquaRefining
> into a to-be-named existing lead smelter with its strategic partner, Johnson
> Controls. Regular updates on scaling of production and other Aqua Metals news
> can be found on the Aqua Metals website (http://www.aquametals.com).
> [Emphasis added].

38.     The statements set forth above were materially false and/or misleading because

they misrepresented and failed to disclose the following adverse facts pertaining to the

Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company was aware of and ignoring material unresolved deficiencies in the AquaRefine technology and process preventing large scale development; (b) the Company was experiencing numerous execution and operational issues preventing scaling and production ramp up at its facility; (c) the Company was unable to produce and generate revenue from its core business, therefore remaining unprofitable, and (d) as a result of the foregoing, Defendants' statements about its business and operations were materially false and misleading at all relevant times.

## THE TRUTH CONTINUES TO EMERGE

39. On August 9, 2017, the Company issued a press release that announced the Company's financial and operating result for the fiscal second quarter ended June 30, 2017. The press release stated in relevant part:

> ALAMEDA, Calif., August 9, 2017 – Aqua Metals, Inc. (NASDAQ: AQMS), which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the second quarter ended June 30, 2017.
>
> **Company Highlights**
>
> ☐    Recognized our first revenues from AquaRefinery 1 at the Tahoe Reno Industrial Center (TRIC) in McCarran, Nevada.
>
> ☐    As of July, the Company had four AquaRefining modules commissioned and in operation. The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017.
>
> *        *        *
>
> **Management Commentary**
>
> "***In the second quarter, the company faced and overcame many challenges as we worked to ramp up production.*** With four AquaRefining modules now online

and our front-end processes operational, we are totally focused on commissioning the balance of the 16 AquaRefining modules and the production of AquaRefined lead. With the operational experience we have gained, we are able to start planning the supply of modules to licensees. The progress that we made is all down to the hard work, creativity and dedication of the team we have built and the continued support of our partners," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals.

Second Quarter 2017 Financials

**Total revenues in the second quarter of 2017 were $603,000, which represents the first commercial revenues generated by the company**.  [Emphasis added].

40.     The same day, Clarke disclosed another list of unresolved and/or partially resolved issues with the process:

So the headlines there are that, breaking and separation is now operational. We mentioned before in previous earnings calls that we would identify some issues around conventional breaking and we were making some improvements – and we've done that, they are installed successfully on - and I'm pleased to say that breaking this operation is operated reliably.

\*     \*     \*

And I'm pleased to say that right now we're operating what we believe to be the best-in-class in battery breaking and separation. And in fact, I didn't expect this to be at this position in having our own IP around battery breaking and separation and this is important to us in the sense that if we are building our own standalone AquaRefining facilities, **than we need the ability to break and separate batteries at a far higher standard than its currently commercially available elsewhere and we will achieve that, that's important**.

**Those improvements will continue and our expectation is that over the next two or three years will be continuing to make improvements in battery breaking and separation and that will add additional intellectual property and services that we can provide to our customers**.

The next part of the commissioning process was to bring the electrolyte virtual we call aqua preparation which is where we take the active material the oxide to sulfates and convert them into the electrolyte that we used to feed to our AquaRefining systems.

And similarly we looked outside of our own skill set and we looked to the leading players in the chemical industry to bring techniques and best practices from the specialty chemical industry to bare on that process and not only it is commission

and running but we've actually achieved a fourfold reduction in the electrolyte volume that means we've reduced the volume of electrolyte that we need to operate by a factor of four which is pretty considerable and I believe it is a remarkable testament to the hard work and effort of the technical and operations team in achieving that.

*     *     *

So I'll just talk about a few of those we've have simplified the design of the modules and reduce some of the components. We've made it fairly significant reduction in plate and voltage and the energy required with significant I'm talking in the 20%.

We've also been able to improve the range of operating parameters that AquaRefining modules can operate under which gives us a high degree of flexibility in operation. We've also made them more robust.

*     *     *

And this is where we start to change the game. This is where we start to make our highest quality product. It's also where we expect our highest margins. So if you look at the improvements we made - and we talked about in the previous slides, with all those improvements and upgrades, we now have five-nine battery processing capacity that we can utilize with the 16 AquaRefining modules that we plan for installation.

And we have the option of producing and selling lead components from AquaRefining feedstock, and we've done this. And as Tom will say shortly, that's where much of our revenue for the second quarter came from.

However, as you'll see in our numbers, the lead compounds have a low value in the less established market than lead alloys. And moving forward, our focus is really about the AquaRefined products and the licensing of AquaRefining equipment.

So it's all about AquaRefining but optimal product mix and profitability. We're focused on running all of our AquaRefining modules to the maximum benefit.

And that means that we may choose to operate the overall facility with an output of less than 120 tons a day, but with maximized AquaRefining. And we're looking to change our product mix to a higher level of AquaRefining product. [Emphasis added].

41.     On that same day, Murphy disclosed that the $603,000 recognized in revenue consisted only of sales of plastic and lead compounds.

22

42.     On the release of the news, the stock price declined from a close of $10.87 per share of Aqua Metals stock on August 9, 2017, to a close of $8.31 per share on August 10, 2017, a drop of approximately 23.55%.

## MATERIALLY FALSE AND MISLEADING PROXY STATEMENT

43.     In addition to the above false and misleading statements issued and/or caused to be issued by Defendants, Defendants likewise caused the Company to issue a false and misleading proxy statement, which sought shareholder votes for, *inter alia*, director re-election.

44.     On April 24, 2017, Defendants caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2017 Proxy") in connection with the Company's annual shareholder meeting.  Defendants drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to the Company's shareholders.

45.     Among other things, the 2017 Proxy provided information about the director nominees up for election, Clarke, Murphy, DiVito, Slade and Stevenson.  In addition, the 2017 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

46.     The 2017 Proxy was false and misleading because it solicited the Company shareholder votes for director reelection even though Defendants were aware, but had failed to disclose: (a) that the Company's breaking and separating process was facing substantial obstacles due to AquaRefining's need for a much higher degree of separation than is normal in the industry; (b) that the Company's breaking and separating process was not operating reliably or efficiently; (c) that the breaking and separating obstacles and issues were negatively impacting

the Company's output; (d) that, as a result of the foregoing, the ramp up of the Company's recycling process was being significantly hindered and delayed; and (e) that, as a result of the foregoing, Defendants' statements about Aqua Metals' business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## THE TRUTH IS REVEALED

47.     On November 9, 2017, the Company issued a press release, revealing that, contrary to its earlier representation that it had "four modules operating now," in reality, it had "a total of 16 AquaRefining modules on-site and in-place," eight "in the final stages of on-site assembly," four "fully assembled but not yet in operation," and the remaining four "assembled and being used to determine the optimal operating parameters for all 16 modules."  The press release stated:

> Aqua Metals, Inc. (NASDAQ: AQMS), ("Aqua Metals" or the "Company"), which is proceeding to commercialize its proprietary electrochemical lead recycling technology called AquaRefining™, has provided a corporate update and announced results for the third quarter ended September 30, 2017.
>
> **Company Highlights**
>
> - The Company currently has a total of 16 AquaRefining modules on-site and in-place. Eight modules are in the final stages of on-site assembly. Four modules are fully assembled but not yet in operation, and the remaining four modules are assembled and being used to determine the optimal operating parameters for all 16 modules.  The ingot production line has cast lead ingots, which will be sent to customers in the fourth quarter of 2017.
>
> - The Company overcame significant challenges with breaking and separation, and has significantly increased the amount of throughput.
>
> - Delivered written notice and commenced discussions with the Company's strategic partner, Johnson Controls (JCI), concerning the retrofit of an existing JCI smelter-based facility whereby Aqua Metals will provide AquaRefining technology, engineering and systems integration.

- Received Notice of Allowance for Aqua Metals' first U.S. patent application from the United States Patent and Trademark Office (USPTO), as well as Notice of Allowance for the first Canadian patent application from the Canadian Intellectual Property Office (CIPO). The Company also secured international patents in Australia, Japan and Korea. The Company's IP strategy includes filings for multiple patents, organized into several families covering "matter," "devices" and "processes," in multiple regions
- Appointed Mark Weinswig as Chief Financial Officer, who joined Aqua Metals with extensive strategic and operational financial leadership.

- Received several accolades for AquaRefining technology, such as winning the *Popular Sciences'* best of "What's New" award in the engineering category, as well as AquaRefining being named a finalist for the 2017 I. Chem. E Global Awards' "Innovative Product" category.

**Management Commentary**

"During the third quarter, we made significant progress towards scaling operations at the world's first AquaRefining facility. We are currently in the process of transitioning to the production of lead ingots that are produced from battery grids and a small amount of AquaRefined lead," said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals.

Clarke, continued: "Looking ahead, we still anticipate having all 16 AquaRefinery modules installed and operational by the end of the year and from there will transition them to continuous operation. Ramp up of AquaRefined lead production is expected to continue through the fourth quarter of 2017 and into 2018 as modules are brought on-line and shifts are added. We faced and overcame multiple challenges during the quarter, and should expect more as we work to scale production.

"Over the last several months, we have strengthened our management and technical team and refocused technology priorities. At this point we strongly believe that investing the resources to fully optimize the operating parameters for our process will better prepare us for both our own operations and the supply of AquaRefining equipment and services to 3rd parties. To that latter point, during the third quarter we commenced discussions regarding the supply of AquaRefining equipment, engineering and other services to support the addition of AquaRefining to a facility owned and operated by our strategic

partner, Johnson Controls. We expect thisaspect of our business to expand and drive shareholder value over the long term."

Third Quarter 2017 Financials

Total revenues in the third quarter of 2017 were $0.6 million, compared to $0.6 million in the second quarter of 2017 and no revenue in the third quarter of 2016.

The Company incurred an operating loss of $5.8 million during the third quarter of 2017 compared to an operating loss of $3.3 million in the third quarter of 2016.

Net loss for the third quarter of 2017 was $6.3 million, or ($0.31) per diluted share, compared to a net loss of $3.5 million, or ($0.23) per diluted share, in the
third quarter of 2016.

The Company had $17.5 million in cash and cash equivalents as of September 30, 2017, compared to $22.1 million as of June 30, 2017.

48.     On that same day, the Company held a conference call to discuss its Q3 2017 results.  On the call, Clarke made statements and answered analysts' questions:

Now I want to focus on our Reno facility to walk through each of the different process steps and provide an update on the status of each. As we've discussed before, our first process includes five steps. Our first step is our battery breaker and material separation system.

Previously, we reported difficulties and delays associated with this first step. So I'm pleased to note that we have achieved very significant improvements in reliability and throughput over the past few months, and the battery breaker is now running consistently seven days a week.

*       *       *

Currently, the four operating modules are being used to achieve the following: The first thing is to accelerate updates aimed at providing a level of robustness suitable for operating by third parties with non-specialist operators. The second feature -- purpose is to map out operating parameters and performance over the full range of operating conditions. The objective is to achieve the highest level of operational flexibility. We believe both activities

26

are coming to a successful conclusion, after which we will apply the control parameters across all 16 modules.

*     *     *

**Analyst:**

Quickly, on some of the details of the current operations, could you maybe provide some additional color on—as to how many tons per day are you guys currently running through the battery breaking system and through the entire process?

**Clarke:**

No. At this time we provided all the color that we're willing to provide at this point.

*     *     *

**Analyst:**

You mentioned in your prepared remarks that four AquaRefine modules are currently being used. Just kind of wondering what kind of utilization rate is with regards to those four modules? Are they being operated 24/7? Or are you still running in batches? How is it going?

**Clarke:**

We're not providing individual tonnage per day, utilization rates or any of that data. What we are saying is that we've got 16 on site. We've got 8 fully assembled. We achieved that. We put four on site and assembled them in less than a month, it was a tremendous effort. I'm confident we'll have all 16 assembled by the end of the year.

49.     On this news, the Company's stock price fell $0.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017.  The stock price continued to decline on the following trading days, falling $0.13 per share (3.5%) on November 13, 2017, and $0.58 per share (16.2%) on November 14, 2017, to close at $3.00 per share on November 14, 2017.

## DAMAGES TO THE COMPANY

50.     As a result of Defendants' wrongful conduct, the Company disseminated false and misleading statements and omitted material information to make such statements not false and

27

misleading when made. The improper statements have devastated the Company's credibility. The Company has been, and will continue to be, severely damaged and injured by Defendants' misconduct.

51. Indeed, Defendants' false and misleading statements as alleged above, have subjected the Company to three complaints for violations of the federal securities laws filed in the United States District Court for the Northern District of California.

52. As a direct and proximate result of Defendants' actions as alleged above, the Company's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

53. Moreover, these actions have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

54. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

55. Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

56. Plaintiffs are current owners of the Company stock and have continuously been an owner of the Company stock during all times relevant to Defendants' wrongful course of conduct

alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

57.     During the aforesaid wrongful course of conduct at the Company, the Board consisted of Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

58.     The Company Board is currently comprised of five (5) members – Clarke, Mould, DiVito, Slade, and Stevenson.   Thus, Plaintiffs are required to show that a majority of Defendants, *i.e.*, three (3), cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action.

59.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

60.     As a result of the aforesaid false and misleading statements, the Company has been made a defendant in a securities fraud action captioned *In re Aqua Metals, Inc. Securities Litigation*, 4:17-cv-7142 (N.D. Ca.) (hereinafter "Securities Class Action.") and will be forced to expend time and treasure defending itself in that Securities Class Action.

61.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

62.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this

action.   For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

63.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

64.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

65.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

66.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

67.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.   While investors were duped into believing the fraud perpetrated by Defendants, two of the Defendants collectively sold over $2

million worth of Company stock at artificially inflated prices based on material inside information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendant Clarke**

68.     Demand on Clarke is futile.  Defendant Clarke currently serves as chairman of the Board and as the Company's CEO, and is thus, as the Company admits, a non-independent director.  As the Company's highest officer and as a trusted Company director at all relevant times, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Clarke is a defendant in the Securities Class Actions.  For these reasons, too, Clarke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Mould**

69.     Demand on Mould is futile.  Defendant Mould has served as the Company's COO since the Company's inception in June 2014, and as a Company director since August 2017.  As an officer of the Company, he is thus not independent.  Mould's insider sales before the fraud was exposed, which yielded over $1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Thus, Mould breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant DiVito**

70.     Demand on DiVito is futile.  Defendant DiVito has served as a Company director since May 2015, and also serves as Chairperson of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. He received significant compensation, including $150,000 in 2016.  As a long-time director and Chairperson of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

**Defendant Slade**

71.     Demand on Slade is futile.  Slade has served as a Company director since June 2015.  He also serves as Chairperson of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  He received significant compensation, including $125,000 in 2016.  As a long-time director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

**Defendant Stevenson**

72.     Demand on Stevenson is futile.  Stevenson has served as a Company director since December 2016. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.  As a long-time director and member of the Audit Committee, he conducted little, if any, oversight of the Company's

engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Stevenson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### DEMAND IS EXCUSED AS TO DEFENDANTS DIVITO, SLADE AND STEVENSON

73.     Defendants DiVito, Slade and Stevenson, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowing Defendants Clarke and Murphy to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants DiVito, Slade and Stevenson were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants DiVito, Slade and Stevenson, as members of the Audit Committee, consciously failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants DiVito, Slade and Stevenson.

### FIRST CAUSE OF ACTION

#### (Against Defendants for Breach of Fiduciary Duties)

74.     Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

75.     Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair

dealing, loyalty, and due care.

76.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

77.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to the Company, Defendants made false and/or misleading statements and/or failed to disclose material information which harmed the Company as set forth above.

78.    In breach of their fiduciary duties owed to Aqua Metals, Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Aqua Metals was aware of and ignoring material unresolved deficiencies with its AquaRefining technology and process that prevented large scale development, including that (a) Aqua Metals' breaking and separating process was not operating efficiently or reliably, (b) the Company's breaking and separating process was facing issues due to AquaRefining's need for a much higher degree of separation than typical in the industry; (c) the Company's output was negatively impacted by the breaking and separating issues; (d) Aqua Metals' ramp up of its recycling process was significantly hindered and delayed; (e) execution and operational issues were preventing scaling and production ramp up at its facility; (f) four of Aqua Metals' operating modules were primarily being used for experimentation as opposed to production; (g) module operators were assisting with  lead removal (h) Aqua Metals was unable to generate revenue from its core business and thus remained unprofitable; (i) Aqua Metals was touting the business value of the Interstate Battery Agreement and the JCI Agreement primarily because of the foregoing issues; and (j) the Company failed to maintain internal controls.

79.     Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

80.     In breach of their fiduciary duties, Defendants failed to maintain internal controls.

81.     Additionally, two of the Defendants, in breach of their fiduciary duties, engaged in lucrative insider sales while in possession of material adverse information and while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

82.     Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Aqua Metals' securities and disguising insider sales.

83.     Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly

and for the purpose and effect of artificially inflating the price of Aqua Metals' securities and engaging in insider sales.

84.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

85.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

86.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending the securities lawsuit, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty Against the Insider Selling Defendants (Murphy and Mould)

87.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

88.     At the time of the stock sales set forth herein, Murphy and Mould knew of the information described above, and sold Aqua Metals common stock on the basis of such information.

89.     The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which Murphy and Mould used for their own benefit when they sold Aqua Metals common stock.

90.     Defendants Murphy's and Mould's sales of Company common stock while in

possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

91.     Since the use of the Company's proprietary information for their own gain constitutes a breach of defendants Murphy's and Mould's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendants Murphy and Mould obtained thereby.

### THIRD CAUSE OF ACTION

### (Defendants for Unjust Enrichment)

92.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

93.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, Aqua Metals.

94.     Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Aqua Metals that was tied to the performance or artificially inflated valuation of Aqua Metals or received compensation that was unjust in light of the Defendants' bad faith conduct.

95.     Plaintiffs, shareholders and representatives of Aqua Metals, seek restitution from Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

96.     Plaintiffs on behalf of Aqua Metals have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

97.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

98.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Aqua Metals, for which they are legally responsible.

99.     As a direct and proximate result of Defendants' abuse of control, Aqua Metals has sustained significant damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Aqua Metals has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

100.    Plaintiffs on behalf of Aqua Metals have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Against Defendants for Waste of Corporate Assets)

101.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

102.    Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

103.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Aqua Metals to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and

business from future customers who no longer trust the Company and its products.

104.    As a result of the waste of corporate assets, Defendants are each liable to the Company.

105.    Plaintiffs on behalf of the Company have no adequate remedy at law.

### SIXTH CAUSE OF ACTION

**(Against Defendants for Violations of Section 14(a)
of the Securities Exchange Act of 1934)**

106.    Plaintiffs incorporate by reference and re-allege each and every allegation above as though fully set forth herein.

107.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

108.    Here, the 2017 Proxy specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.  The 2017 Proxy failed to disclose that express terms of the Code were being violated.

109.    Had this information been known, Aqua Metals shareholders would not have voted to re-elect the offending directors.

110.    The 2017 Proxy also violated Section 14(a) and Rule 14a-9 because it solicited Aqua Metals shareholder votes for, inter alia, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its AquaRefining system.

111.    As alleged herein, in the 2017 Proxy, Defendants specifically referenced the

Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate. Because the Company, under Defendants' direction and on their watch, was issuing false and misleading statements, Defendants affirmatively violated the Code. The 2017 Proxy failed to disclose that express terms of the Code were being violated.

112.   Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2017 Proxy, Defendants were aware of this information and of their duty to disclose this information in the 2017 Proxy.

113.   Defendants knew that the statements contained in the 2017 Proxy were materially false and misleading.

114.   The omissions and false and misleading statements in the 2017 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to shareholders.

115.   As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy, Defendants used to obtain shareholder approval of and thereby re-elect directors, nominal defendant Aqua Metals suffered damage and actual economic losses (i.e., wrongful re-election of directors) in an amount to be determined at trial.

116.   As a consequence of the foregoing, the Company was damaged as a result of Defendants' material misrepresentations and omissions.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Declaring that Plaintiffs may maintain this action on behalf of Aqua Metals, and that Plaintiffs are adequate representatives of the Company;

B.     Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Aqua Metals

C.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

D.     Awarding, against Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' wrongful conduct, including breaches of their fiduciary duties;

E.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

**O'KELLY ERNST & JOYCE, LLC**

DATED: April 4, 2018          By: */s/ Ryan M. Ernst*
                                   Ryan M. Ernst (#4788)
                                   Daniel P. Murray (#5785)
                                   901 N. Market St., Suite 1000
                                   Wilmington, DE 19801
                                   Tel.: (302) 778-4000
                                   Email: rernst@oelegal.com
                                   Email: dmurray@oelegal.com

                                   **GAINEY McKENNA & EGLESTON**
                                   Thomas J. McKenna
                                   Gregory M. Egleston
                                   440 Park Avenue South
                                   New York, NY  10016
                                   Telephone: (212) 983-1300
                                   Facsimile: (212) 983-0380
                                   Email: tjmckenna@gme-law.com
                                   Email: gegleston@gme-law.com

                                   *Attorneys for Plaintiffs*